Good morning, Your Honors. Council. My name is Michelle Porro and I'm here today on behalf of Manuel Bejarano. His accident is not in dispute. On June 14, 2007, he was lifting a rock that weighed between 400 and 500 pounds with three of his co-workers. One of those co-workers dropped his portion of the rock and caused the load to shift, which injured Mr. Bejarano's back. I would request that the justices review the video if you've not actually done that in this particular case, because I think that the video actually supports the petitioner's case and also the testimony regarding what he's capable of accomplishing in a day. The work compact is a remedial measure and the evidence is to be construed in the light most favorable to the injured worker. So there's an issue here. I mean, I don't think I'm oversimplifying it, but you've had testimony of Dr. Lash, how do you pronounce that? Who obviously testifies, gives a causal connection opinion in favor of the claimant. Dr. Lamby lined up on the opposite side, held that the condition of ill-being was not caused by the work-related accident, and the commission found that Lamby's opinion was more persuasive. So what do we do with that? I believe that that finding was actually contrary to the manifest way to the evidence. And if you look, you can see that there are actually eight different places that Dr. Lamby's reports were either based on incorrect information or there was missing or incomplete data. The first was that Dr. Lamby did not see the MRI films that he had requested in his March 30, 2009 report. The second is Dr. Lamby did not see the CT films that he himself requested to determine whether or not the L5-S1 fusion was solid. That request was made at page C810 of the record. The third is Dr. Lamby relied upon a video to say that Bejarano could lift up to 50 pounds when there is absolutely nothing that he did in that video that would have weighed 50 pounds. He didn't do anything that lifted more than a few pounds. And the only thing that I saw him lift on the video that had any substantial weight was a hose. And a 50-foot, half-inch garden hose weighs approximately three pounds, per the information I was able to garner. What do you make of this? This was curious, because in addition to adopting the opinion of Dr. Lamby, the Commission actually found that Dr. Lachey's opinion supported Dr. Lamby's conclusion that the claimant's complaints of neck, upper back and right leg pain were not related to the accident. The claimant actually found some support for Lamby's opinion in Lachey's records and Lachey's opinion. And I'm not making a claim for the neck or the upper back issue at all. The records that the testimony of the petitioner actually shows that he has had consistent low back, left leg and left foot pain, and he's had left greater than right leg pain throughout the pendency of this accident. But what do you make generally in regard to the Commission's findings that cited that the claimant's doctor's records and opinion actually supports Lamby's opinion? What do you make of that? I think that that's actually incorrect, because... The Commission was incorrect in finding that. I think we're incorrect in finding that, absolutely. Yeah, actually, because Dr. Lachey testified that he felt that the petitioner's condition actually was causally related to the June 2007 accident in his deposition when he testified for us under oath. And Dr. Lachey... I'm sorry. Go ahead. Did Dr. Lachey... Is it Lachey or...? Lachey. I think he pronounced it Lachey. Did Dr. Lachey also find that the claimant was at MMI in July of 2009? I don't believe that he did. He was still actually requesting the SI stabilization surgery and potentially giving him the neurostimulator as well to try to interrupt the pain signals to the brain. So at the time that we took Dr. Lachey's deposition, that was still his treatment recommendation. So Dr. Lachey did not give an MMI opinion that related to the July 23, 2009 visit? In other words, he didn't say that he was at MMI at that time? Not to my recollection, actually. When we took his deposition, actually, subsequent to that, he was still recommending the SI joint stabilization, and he was also recommending the trial of the neurostimulator to see if they could interrupt the pain signals to make him more functional. With regards to the issues with Dr. Lamy's reports and the deficits, the fourth thing is that Dr. Lamy had based his opinions on the mistaken assumption that Bejarano was taking no pain medication, where Bejarano actually was taking Norco, which he was actually taking prior to Dr. Lamy's report from 2011. He had actually been taking it since October 2010. He was on Cymbalta, which is an antidepressant, which actually prolongs the body's natural painkillers, and he was also on Lyrica for neuropathic pain and spinal cord injuries pursuant to the testimony of Dr. Lachey. Dr. Lamy based his opinions also on Mr. Bejarano having no relief from the injections, but the records actually show that he had two to three weeks' worth of relief following the injections, and he had some relief after the SI rhizotomy for two to three days until he had returned to physical therapy. And that can be found at pages C-53, C-164, C-291, and C-541 of the record. Dr. Lamy's opinion was also based upon a misunderstanding that Bejarano did not use medication for his diabetes, but Mr. Bejarano testified that he took metformin for the diabetes as well. And Dr. Lamy had stated that the foot numbness and tingling is due to diabetes, where Dr. Lachey testified that it does not fit the stocking and glove distribution which you would expect it were due to diabetes, and actually he testified that it was in a radicular pattern affecting the left leg and foot, not a bilateral foot problem as you would expect with diabetes on page C-186 of the record. Dr. Lamy had indicated that the symptoms were on both feet where all the records in the testimony showed that it was low back pain, left greater than right leg pain, and left foot pain. And furthermore, Dr. Lamy is the second doctor that was chosen by the respondent. Dr. Schaaf after Dr. Sitow found that Mr. Bejarano was in need of the L5S1 fusion that he underwent. It's also notable that Dr. Lachey had indicated as early as September of 2008 that he thought that he may need to do a posterior procedure on Mr. Bejarano because the surgery that he  did, where they inputted a cage and they did not flip him to do the posterior procedure, which you often see them do if they're going to do an anterior procedure. Usually they flip him and put hardware in the back as well. So, I feel that the commission erred when they determined that March 30th of 2009 was a date when he had reached MMI because Dr. Lachey had the petitioner off work at that point and he had prescribed treatment and testing including a myelogram, dynamic x-rays of the lumbar spine, and EMG of the lower extremities. And he had also prescribed physical therapy twice a week for the petitioner at that point. And on page C175 of the record, Dr. Lachey had testified that the low back and leg complaints were caused by the June 14th, 2007 work injury. The commission's reliance on the opinion of Dr. Lachey is as flawed as it was in the Tolbert case. And the IME physician in both Tolbert and in the case at bar rely upon incorrect or missing information to formulate their opinions. And this is clearly contrary to the manifest way of the evidence. The credible evidence that was submitted shows that the petitioner was not at MMI on the day of hearing. He was waiting for the prescribed SI stabilization surgery on that date. And Dr. Lachey's recommendation for that SI joint stabilization was supported by the vacuum phenomenon that he had noted in the diagnostic studies per Dr. Lachey's testimony at page C188. As I said before, Dr. Lachey's notes as early as September 8th, 2008 indicated that Bejarano may need the posterior decompression for the SI joint pain. And that's within five months of when he had the original surgery for the anterior fusion. And Dr. Lachey testified that he would not recommend the SI fusion if in fact the condition were not objectively treatable. So for the Tolbert case where the respondent's IME is based on incorrect or inaccurate information, the commission should not rely on the respondent's IME to deny TTD or medical treatment. Our second argument is that the commission erred in failing to award the treatment to the petitioner after the March 30th, 2009 date. Section 80 of the Act requires the respondent to provide a pay-for-all treatment incurred to cure or relieve from the effects of the accidental injury. All of the treatment through the date of the hearing had been to cure or relieve from the effects of the June 14th, 2007 work injury. The commission should have awarded the bills that were presented at the time of the hearing pursuant to Section 8A and 8.2 of the Act. And they should have also awarded the treatment that was prescribed by Dr. Lachey pursuant to the plantation manufacturing case. As of the date of the hearing, the prescribed procedures had not been authorized and therefore not yet performed. And Dr. Lachey testified that the need of the SI fixation was a direct result of the injury suffered by Bay Hirono at work on June 14th, 2007 on page C-175 of the record. Our third argument is that TTD should have been awarded from December 17th, 2007 through August 13th, 2003, which was the date of hearing. The TTD is to continue as long as the total incapacity lasts per Section 8B of the Act. The Supreme Court in Mount Olive Coal in 1920 held that TTD is the temporary period following an accident during which the injured employee is totally incapacitated by reason of the injury and it is considered temporary in the sense that the disabling condition exists until the employee is so far restored as his injuries will permit. In 1988, the Supreme Court in Sunshine held that the employee is not required to prove complete inability to perform all work in order to actually receive TTD benefits. And in 2002, this Court in the Anders case held that the worker has not reached MMI on the date he was returned to work on a light-duty basis and was entitled to continue TTD benefits as the employer refused to provide work within the restrictions. Even the Respondent's IME in this case, Dr. Lamey, determined that Mr. Bay Hirono required lifting restrictions of 30 to 50 pounds, which prevents him from returning to the pre-injury work that he had as a laborer where he had to lift between 100 and 150 pounds on a daily basis. Furthermore, the Respondent did not make any offer to return Bay Hirono to work within those restrictions after the March 30, 2009, IME of Dr. Lamey. Bay Hirono's incapacity is ongoing to date and he still has not been able to obtain the prescribed procedure for Dr. Lake. His inability to obtain treatment has prevented him from reaching MMI unless his TTD benefits should continue through the date of hearing, which was August 13, 2009. Now, the Commission found the claimant had reached MMI as of March 30, 2009, essentially relying on the opinion of Dr. Lamey, correct? Correct. So, if the Commission believed Lamey, we would still have to reject his opinion on the MMI as well, would we not? If the Commission believed Lamey, I don't understand how you can rely on that since I pointed out eight different places where Dr. Lamey's information was either incorrect or incomplete. He didn't have the MRI films he requested, he didn't have the CT scans he requested to make sure that the fusion was solid. He incorrectly indicated that the petitioner wasn't taking any medication, so he didn't need surgery or a nerve root stimulator because he was taking the medication. So, if the Commission believed Lamey,  Well, I think the question was asked of you. Okay. The question was asked of you is we rule against you on the issue of causal connection to current issue of well-being, then you also lose on your other two issues, do you not? The other two issues, I think, are definitely intertwined with this issue, correct. Okay. Counsel, you'll have time on the floor. Thank you. Good morning, members. Counsel, my name is Justin Melanious of Coachella Law Group, and we represent the Respondent, John Henry Holmes, in this matter. Your Honor, before I begin my argument, I would just like to address some of the issues that Petitioner's Counsel brought up in her oral argument. First, starting with   the alleged deficiencies or lack of information for Dr. Lamey's opinions. Well, that's really the key of what you're saying. She obviously recognizes as the Commission specifically recited, they relied or they adopted, I should say, Lamey's opinion over Lake's opinion. But she spent a lot of time pointing out a number of alleged defects in Lamey's opinion. So, what have you to say to that? And to that, Your Honor, I'll kind of go in order. Counsel had referenced that there were deficiencies in Lamey's opinion would be insufficient. Well, Dr. Lamey had the MRI radiologist report. And the film that he mentioned, he didn't say it was critical to his opinions. He said it would be useful. And the reason he said it would be useful was to determine if the 2008 fusion that the Respondent authorized and paid for was reasonable and necessary. We weren't disputing that. It wasn't in reference to him needing these MRI films to determine if any future fusion would be necessary. Because as of that first IME, this future fusion hadn't even been recommended to the Respondent as of that time. The second IME, the CT films, he mentioned it would be useful to review to determine if, again, the 2008 fusion had healed. Well, subsequent to that time, he had reviewed x-rays of the spine that showed that the fusion had been inserted or had been undergone, as well as the fact that, again, he had the CT scan of the radiologist report indicating the findings of the radiologist. So he had reports to rely on. He had x-rays for reliance. He just did not have the scan. But both of them were in reference to the prior fusion procedure, which is not in dispute. We authorize that. Regarding the lack of pain medications, what counsel is forgetting, yes, pain medication had been prescribed throughout the period of treatment. However, at the time of the IME where Dr. Lamy gave that opinion, he was not taking pain medication. He was taking Lyrica, which is commonly used for diabetic neuropathy. And as I'm sure you're aware, within the record, his diabetic condition by both Dr. Lamy and Dr. Leitch had noted that that's something that certainly plays a role in the radicular complaints that the petitioner was experiencing. He was also taking Cymbalta, which is used typically to treat depression. And Dr. Leitch, his treating physician, had said he, too, had concerns of pain being associated with the psychological issues of Mr. Bejarano and his treatment. Neither one of those medications, I believe you would agree, are what you would consider your typical pain medication for someone that is allegedly experiencing a back pain. That would be something more along the lines of a Norco, Ultram, that wasn't indicated. However, after the IME where Dr. Lamy stated he wasn't on pain medication, that is when a prescription of a, I believe it was 90 pills worth of Norco was prescribed. But that was after the third IME, not prior to it. The only two months prior were months before, and they were for, I believe at one point, a 90-day period of Norco. And again, that was two to three months prior to that IME. As well as not taking medication for his diabetes, in the petitioner's testimony, he had admitted that at one point he was taking vinegar to treat his diabetic condition. We did not have records from the petitioner showing that outside of the medication for the diabetic neuropathy, that he was taking medication such as insulin to treat the diabetic condition. Instead, he was taking something to treat a side effect or symptom of diabetes, which is the neuropathy in the extremities. Another issue to point out, counsel had mentioned that we doctor shopped in regards to our opinion with Dr. Sittow. It's true we retained Dr. Sittow to give us an opinion as to whether that 2008 fusion was necessary. He said that it was. We authorized the procedure, and the petitioner underwent it and responded and paid for it. We didn't switch over because of his opinion. We honored his opinion. We didn't go straight to Lamy and then try to have another opinion to counter that. We authorized the procedure, so there was no doctor shopping involved. In regards to the Tolbert case, which counsel appears to be relying upon in regards to why it's analogous to this case and why Dr. Lamy's opinions were insufficient, we argue that the facts in that case are completely contrary to what the witness wanted. I have a recommendation. Please. This is only a test. To help Hawaii State Police to detect the intent of the building's public address, this is only a test. If this is an actual incident, you will be issued further charges via the public address. This is only a test. It's good to know. In the Tolbert decision, the IME that the commission had relied upon, well, first and foremost, it was one report. In this case, we have three full IMEs with Dr. Lamy, as well as a fourth addendum report. Within that Tolbert IME, the court had held that it was insufficient and that it appeared to be answering questions, but the questions weren't in front of the judge, or weren't contained within the record. So we kind of had no idea what he was responding to. And he never personally examined the petitioner. This was all based on just questions that he was asked. In this case, you have four total reports, all clearly written, all clearly organized. Three in-depth examinations of the petitioner, which included a full review of medical records, as well as examinations, again, of the petitioner to determine what complaints that he was experiencing. And we would argue that unlike Tolbert, where it was kind of a reverse, they found that the IME physician corroborated the treating physician's opinions. That's not the case here. It's the opposite. The treating physician, Dr. Leitch, his opinions supported Dr. Lamy's opinions multiple times. I was about to ask you that, because I had asked opposing counsel about that. In addition to relying on Lamy, the counsel for the commission seemed to indicate that it found some parts of Leitch's testimony in his record supportive of Lamy. I don't know that she agrees with that, but what can you call to our attention that corroborates that representation? Your Honor, I have three major ways that he corroborated the testimony of Dr. Lamy. The first being the diabetic condition. Dr. Lamy's opinion was that the particular complaints were related to the diabetes. Dr. Leitch, in his evidence deposition, testified that the petitioner's diabetes certainly has to play a role in the numbness and tingling that he was experiencing within his extremities. In regards to symptom magnification, Dr. Lamy, there was a video that was referenced where he reviewed that. The other triers, in fact, reviewed that. And Dr. Lamy felt that not only the video showed symptom magnification based on what he saw that was depicted and what the petitioner had told him, but in that second IME, he put a pen on the ground. He asked the petitioner to pick it up, which he said the petitioner did very slowly and with great pain expressions. While the video did not depict the petitioner in any apparent pain or difficulty completing many tasks. And also with MMI, Dr. Lamy placed him in MMI March 30, 2009. And in that July record, you will see I believe it's the fifth or sixth bullet underdiagnosed, Dr. Leitch states would be placed at maximum medical improvement. Now, granted, he continued to treat him, but that was within the record within months of Dr. Lamy. Highlighting back on the symptom magnification since, again, that was a key issue with respondent. It was not only found by Dr. Lamy, it was not only found by Dr. Leitch, but the commission heard the testimony of the petitioner, viewed the video that was introduced into the record, and found the petitioner to lack credibility in that the symptoms and complaints that he had testified to were in excess of what was depicted in the video and in the records. And one last issue about the video, Your Honors. While there has been some dispute between the parties in regards to what the video depicts, there has been no dispute on the record of the fact that regardless of what activities were completed, there was no pain, there was no difficulty that the petitioner seemed to show in the completion of any of those activities. And lastly, just to bring it around, we see this as a standard of review case, as it being manifest weight of the evidence. The commission's job is to resolve those facts, or the questions of fact and causation, to judge the credibility of witnesses and to resolve conflicting medical evidence. And as the finder of fact, they're given deference on these issues and their determination must not be disturbed unless it's against the manifest weight of the evidence, which is only the case if the opposite conclusion is clearly apparent from the record, that the conclusion the opposite conclusion was clearly the proper result. And when viewing the evidence in a light most favorable to the agency, the court determines that no rational trier of fact could have agreed with the agency's decision. And given that Dr. Lange's opinion, which the commission found to be most credible, was supported multiple times by Dr. Lange and also with other evidence introduced at the record, the respondent argues that the commission's decision was not against the manifest weight of the evidence and therefore should be affirmed. Thank you. Thank you, counsel. Counsel, you may reply. Thank you, Your Honors. With regard to the deficiencies, with the information that Dr. Lange had, he had the MRI report only. He did not receive the CT films that he wanted. CTs and x-rays are two different things. In the order of the CT, which is a much more invasive test for the reason of checking at various levels, because they'll do different sections to see if the bone has grown all the way through, and that's something that you can't find out on an x-ray by itself. So Dr. Lange did not have the CT scans that he had requested. With regard to the pain medication, counsel's assertion there is incorrect. The petitioner was taking Norco as of October of 2010, and the Cymbalta and Lyrica were also prescribed for the radicular pain, because it's a nerve pain that the petitioner is suffering from as well. And Dr. Lange did testify that he felt that the pain that the petitioner had that went from his low back down into the left leg and foot was of a radicular nature. With regard to the diabetes, the petitioner did actually at some point take vinegar. I don't know why, but he did also testify that he was taking metformin, which is an oral insulin. Now, with regard, we also need to keep in mind that the petitioner has a fourth grade education from Mexico, fourth or fifth grade education from Mexico, doesn't read or write English, reads and write a little bit in Spanish, has always done heavy labor. He's not the kind of guy that I could send to my office to sit down and do any kind of clerking or desk work. He doesn't have the skills to do that. With regard to Lake corroborating LAMI, Dr. Lake did indicate that some of the symptoms that the petitioner had could have been caused by the diabetic condition, but he did testify that he felt that the low back, left leg, and left foot condition were a direct result of the injury that he had sustained back in June of 2007, and the treatment that he was recommending, that SI, joint stabilization procedure, was ordered to cure or relieve the effect of his June 2007 work injury. There is some indication that the petitioner may have had some psych overlay, and I'm looking back through some notes here, and I see that there was an indication in June of 2009 that the condition was for the fusion surgery itself, but it appears that there was still an issue of SI joint dysfunction that Dr. LAMI was treating at that time, so he wasn't at MMI for the condition completely, but I would say he was for the fusion. But he still had issues with the SI joint, but continued to have the petitioner off work and continued to request treatment, and Dr. Lake did note in his February 4, 2010 visit with Mr. Bejarano that the injections that the petitioner had been prescribed by him were not actually approved, so even when he saw him on July 23, 2009, he was still recommending the SI joint injections, which were not approved, so there was a continuation of the treatment course for the petitioner at that time. With regard to the video, I hope that you've all watched it, because honestly, and it's not very often that I'm going to tell you this, but the video actually corroborates what the petitioner testified to. The video is actually part of the record. There's one disc. There are five judges. It's like whenever, and this is for all counsel, whenever a video is very important to our consideration, a copy ought to be put in the brief so that we can all have the record for five judges, and we all have offices around the state. And because the, as the petitioner, I did have one copy of the video, and the one copy that I had actually was submitted into the record because I had actually seen it and viewed it because we did not watch it with the arbitrator, so there is the one copy. Do you understand what I'm saying? Make a copy of it and give it to each of the judges to be able to look at. That's the way to do it. It's not impossible to share, but it's relatively inconvenient. It's an issue especially in light of the fact that the arbitrator's decision that the commission adopted specifically says the arbitrator reviewed the surveillance video, and it depicts symptom magnification. You know, and I would ask you to check out the dissent that was written by Commissioner DeVrent as well, because he indicates that he felt that there was no symptom magnification. He felt that it corroborated the petitioner's testimony on what he was capable of performing on a given day. All right. I've been doing this for 20 years, and no one's ever told me that we needed to submit a video with the depositions. Well, you don't need to do that if you have the opportunity to. Right. And I will do that in the future, but I would ask that you take a few moments and view the video, which is actually found in the record, because I do think that that is kind of the linchpin of this entire case. He's not doing anything that he says he can't do in that video. He's getting into and out of a car. He's picking up some very light Halloween decorations. He bends over at some points in the garden, and he picks up a hose. And like I said, a 50-foot-long, half-inch garden hose weighs approximately three pounds. So he's not doing anything that's anywhere close to the 50-pound restriction that Dr. Lamy indicated he was capable of. Thank you, counsel. Thank you both, counsel, for your arguments in this matter. We'll be taking our advisement that this position shall issue. Court will stand in brief reset. Thank you.